And one warning, the court will take a 10-minute break after the conclusion of this argument and before the beginning of the argument in StarNet Insurance. Mr. Kovnat. Good morning, Your Honors. May it please the court. Can everyone hear me? Yes. Thank you. Hi. Good morning, Your Honors. May it please the court. My name is Philip Kovnat, counsel with the EEOC as appellant. In this case, Walmart responded to Edward Hedekin's request for a religious accommodation by rescinding a job offer that it had made to him and insisting that he reapply for what was in effect a demotion. Now the district court deemed this a reasonable religious accommodation as a matter of law and district court held that Walmart proved that accommodating Hedekin in the assistant manager position would have posed an undue hardship. The district court erred on both of these grounds. Now as to the issue of reasonable accommodation, the accommodation that Walmart provided here, which was to tell Hedekin that it would help him apply for lower-paying and lower-ranking jobs, was not reasonable as a matter of law. And that's because a critical legal principle in this context is that although an employer does not have to offer an individual his preferred accommodation, an employer does have to offer an accommodation that reasonably preserves an individual's pay and job opportunities. Did Mr. Hedekin have any obligation to explore the pay he might have been able to earn in one of those hourly positions, or is it your position that since those positions were non-managerial positions, they were just not a reasonable accommodation? Your Honor, the answer to your question is no. He had no obligation to engage in this case, and that's for two reasons. First, what Ms. Ahern, the human resources manager, offered was the ability to apply. And she made very clear that he had the ability to apply and compete for lower-paying and lower-ranking jobs. So it is the combination of the fact that the jobs were not… How did she… Did she use the word compete? Ms. Ahern did not use the word compete. I think that was a reasonable conclusion that Mr. Hedekin drew from the conversation, because she said, what Ms. Ahern said specifically was, tell me of any other jobs that you're interested in, and I can assist you in submitting an application. And then they had a subsequent conversation in which she reiterated that he would have to reapply. And so his understanding, which was an understandable understanding at the time, was that he would have to start over, submit an application, interview, and compete. And, Your Honor, Walmart has been litigating this case for two years, and not once has Walmart said, oh, this was just a formality, you know, he would have gotten the job if he had expressed interest. They have been very clear that he has to… Yes, Your Honor. Counsel, is there any indication that Mr. Hedekin would have accepted such an hourly job if one had been offered without the need to go through an application process? There is no indication one way or the other, but because we're on summary judgment and a reasonable inference that could be drawn… Well, one way or the other, of course, summary judgment is the put up or shut up time in a lawsuit. And so if this matters, one would expect the plaintiff to offer evidence about it. Well, what matters for purposes of whether Hedekin had a legal duty to engage with Walmart is what Walmart offered in the first place. There is no… I didn't ask. I didn't… Counsel, please. I didn't ask about whether someone had a legal duty. The question I'm asking is whether this matters, whether the difference between being given an opportunity to apply and being told the position is yours if you want it matters. It might matter if Hedekin would accept the job. It doesn't matter if Hedekin doesn't want this job. That's why I'm asking what the record shows about whether he wants the job. I understand. And the record is silent on whether he would have wanted one of these lower-paying, lower-ranking jobs. But what we are saying is that it would be a very strange rule for this court to implement for an employer to be able to offer something that is on its face unreasonable because it requires someone to start over and compete for a demotion, and that that would trigger some obligation on the part of the employee to somehow carry out that unreasonable offer. Now, of course, if an employer offers something that's reasonable or even something that would require participation to determine whether it's reasonable, then perhaps there would be an obligation. But because what Walmart offered here was on its face unreasonable, Hedekin had no duty to engage with that offer. Would it have made any difference if Ms. Ahearn had said, we will offer you one of the hourly supervisory positions? And we think after a short period of time, you'll be making essentially the same amount of money that you would have as an assistant manager, rather than basically tell him, you have to start at ground zero. Your Honor, it's our position that it would not have made a difference because our principal argument is that if an employer can accommodate someone in the job that it has offered them and not demote them, then an employer should try to do that. Now, I understand in this hypothetical that you posed, it would be a much more difficult case for us. And the good news for this court is that this court doesn't have to reach that or address what would have happened in that hypothetical because that is not what she offered. She was firm in saying he would have to reapply. And so the critical legal principle that is sort of at the core of the EEOC's argument is that for an accommodation to be reasonable, it has to not unnecessarily or unjustifiably diminish someone's pay and job opportunities. And that really does flow from the text of the statute and from the decisions of this court, including Wright v. Runyon, Rodriguez v. City of Chicago, and Porter v. City of Chicago, which all held that the accommodations there were reasonable, but only after emphasizing that they fully preserved the individual's pay and job status. And in all of those cases, this court made clear that if the accommodations had not preserved the individual's job status, a much more rigorous or much more searching inquiry would be necessary. So that essentially means it would not be susceptible to a summary judgment disposition. And so under the standard that an accommodation must not unjustifiably diminish an individual's pay and job status, what Walmart offered here was not reasonable as a matter of law, because when Walmart was presented with Hedekin's request for accommodation, it decided to rescind his job and tell him he could reapply. But Walmart had two readily available alternatives, one being just to simply offer him one of those lower paying, lower ranking jobs, which Walmart has not identified any countervailing hardship or inconvenience whatsoever as to that option. And then the other option would have been to simply try to accommodate him in the job that it offered him, which through the measures that the EEOC mentioned in its brief, which are shift swaps, modified schedule, the use of paid time off, things of that nature. And so what we're saying is that because Walmart had at least one, if not two, readily available alternatives and they better preserved Hedekin's employment status and Walmart was unjustified in not offering those, then Walmart, at least a jury could determine that Walmart did not offer a reasonable accommodation. I think the other aspect of this case, as we've already touched on, is the issue of cooperation and whether Hedekin was under any duty. So unless the court has additional questions about that or about the reasonable accommodation, I can move on to the undue hardship issue in this case. Okay, just one sort of housekeeping matter related to undue hardship that I want to raise with the court is that there are two cases pending certiorari in the Supreme Court right now that will vary, that if certiorari is granted will address the undue hardship standard. So that may well affect the analysis in this case. And I'm happy to provide the names and numbers of those cases. And the EEOC will file a 28-J letter if cert is granted on any of those cases. So with respect to the undue hardship in this case, now, undue hardship is an affirmative defense. And so for Walmart to obtain summary judgment on an issue in which it has the burden of proof, excuse me, its evidence must be so overwhelming that the only reasonable conclusion to draw is that any and all of the accommodations proposed here would have posed an undue hardship. And Walmart's evidence just does not rise to that level. A jury would not be required to agree with Walmart, for example, that adjusting Mr. Hedekin's schedule at most once a week for a fluctuating sunset time would pose anything more than a minor inconvenience on the store manager. Similarly, a jury would not be required to agree with Walmart that voluntary shift swaps were impossible here because Walmart's arguments on that point are based on the speculation of its human resources manager who just assumed that Hedekin's co-workers may not want to swap shifts with him and may have plans, but she never actually asked these assistant managers. There's no affidavits in the summary judgment record from these prospective co-workers saying that they would not be willing to swap shifts. So a jury would just not be required to agree that this was impossible. There's nothing objective. Would it have been enough for Ms. Ahern and Mr. Buck to put out a general inquiry to see how many assistant managers would have been willing to cooperate by taking more Saturday assignments, or do you think they were required to actually try to put together a draft schedule to see if it were feasible?  HEDEKIN. We're not taking the position that there was some categorical rule that they had to implement a draft schedule or even necessarily take a survey. I think the point is that Walmart has to produce some evidence, whether it's mathematical evidence showing that it would be impossible mathematically to allow for these shift swaps, or testimony from the co-workers, or a survey, as the Ninth Circuit addressed in that Opuku Boateng case, any of those things would support Walmart's affirmative defense that shift swaps would pose an undue hardship. But actually, voluntary shift swaps were only one possibility here. I mean, there were at least two other ways that Walmart could have accommodated Hedekin that it has not shown posed an undue hardship. One of those is the use of paid time off, which is quite interesting in this case, actually, because the human resources manager just assumed she was under the mistaken assumption that Mr. Hedekin would not have any paid time off, but that's actually not true. The record shows that he would have had some paid time off, and the human resources manager never asked anybody whether that was true or not. And so, and Walmart has never said that he couldn't have used at least some of those days to avoid status shifts. So again, this just goes to show that the record is not so overwhelmingly clear that a jury would be required to agree with Walmart that any and all of these accommodations would have posed an undue hardship. And how do you think Walmart should have presented the matter to other employees? What, if anything, should they have been told about the reasons for Mr. Hedekin's scheduling request? Your Honor, there would be nothing prohibiting Walmart from telling the other assistant managers that an individual has a Sabbath observance, wishes to observe the Sabbath, and would anyone be willing to, for example, take a Saturday shift instead of a Sunday shift? Or, for example, there are cases about individuals who want to take a Thursday off for a community college course, and that certainly could have been possible here. We just don't know because there's no evidence in the record from Walmart on that issue. So, you know, of course, a human resources manager isn't required to ask any specific questions, but it would help if there were some evidence in the record for Walmart on that point. And I see, I may have eaten into my rebuttal time, but I would like to save some time for rebuttal. The Council, you have all of 45 seconds left. Mr. Byland. May it please the Court, Jeremy Byland on behalf of Walmart. Your Honor, there really are only two issues here, and you need not go past the first, and that's because Walmart fulfilled its obligation under the statute in opening a good faith dialogue with Mr. Hedekin about reasonable alternatives, and the fact that Mr. Hedekin declined to engage with Walmart. What is reasonable about this? Your Honor. Mr. Hedekin applying for another position, it seems to me that when Walmart formally rescinded its offer and said that he could apply for another position, even if it was with Ms. Ahern's help, Walmart was essentially treating him as a stranger rather than actually offering an accommodation to him. Apart from whatever help she might have offered, he was in no better position than any first time applicant. Your Honor, he was, but to take a step back, I think the government has misconstrued the timeline. Looking at Mr. Hedekin's own deposition, let me walk you through the timeline. So in his email, it's Special Appendix 23, he notifies Walmart on May 2nd, I'm not going to complete the onboarding process for Assistant Manager until you placate me, okay? Mr. Hedekin stops the hiring process. On or about May 13th, there's a phone call between Ms. Ahern and Mr. Hedekin. You can see this at Special Appendix 36 to 37. Mr. Hedekin talks about the phone call happening before May 14th. In that discussion, Ms. Ahern identifies several other positions that could accommodate Mr. Hedekin, and he expresses no interest in them. Only after not hearing anything from him, did the following week that they closed out the hiring process that Mr. Hedekin decided not to complete. It wasn't Walmart that threw Mr. Hedekin out in the cold. Mr. Hedekin made the decision not to complete the process. Yes, but the EEOC had made the point that encouraging Mr. Hedekin to apply for a non-salary, non-managerial position. I mean, that's not really offering him a comparable position with the company. If you want to address that point, I'd be very grateful. Yes, Your Honor. Happy to. The EEOC, in its own brief on page 25, says that this is the most comparable position in the store to the position that he could not do the job duties of. Going to both prestige and pay, which I think may be your question, Lee Spood, we've provided this in Special Appendix 1 through 2. He talks about how these positions are very similar. They're both managerial positions, Your Honor. These hourly supervisors, they oversee departments. They manage other employees. And so there's nothing about the prestige of these different positions that make this so unreasonable that he doesn't even have to open a dialogue with Walmart. The second thing about pay is, well, what does the record actually say about pay? There's four things the record says about pay. One, salaried managers work 8 to 20 hours more per week than their hourly counterparts. Right? They work substantially more than the hourly counterparts. Two, hourly supervisors can get overtime. Three, hourly supervisors can get a bump in pay for experience. And then the only evidence in the record about what the difference of pay is, is it's a small decrease. But again, you're working many fewer hours. And like, the cases are replete and the circuits are unified that a reduction in pay for less hours is okay. I mean, in Philbrook, the Supreme Court counted that explicitly in allowing for unpaid leave as a religious accommodation. So there's nothing, I mean, taking a step back on reasonableness, Your Honor, there's nothing about offering the most comparable job by the EEOC's admission in the store, there's nothing about that that makes it so unreasonable that Mr. Hedekin's final pay package will be. I just don't see if, how you can make a rule that offering the most comparable position in the store is per se unreasonable. Can you tell me this? Just what happened here with Mr. Hedekin? Would that also occur with members, for instance, of the Orthodox Jewish faith who cannot work on their Sabbath, which happens to be Saturday? Your Honor, it may happen in the Hayward. This is like unique to the Hayward, Wisconsin store. The fact that he was applying at the beginning of the summer, the busiest time at that store. The fact that it's a zero-sum game, you have only eight assistant managers. And the fact that they just couldn't accommodate him in that assistant manager job, but the fact that they could find him this comparable job, I think is very reasonable. But I don't think it would matter which faith he ascribed to, nor are we maligning his faith or anything like that. There's no hint in this record. No, that is not my question. What my question is, is that there are other faiths who have the same exact situation as Mr. Hedekin's faith does. And they would be treated similarly in this story, Your Honor. They would be treated in the same way. You see, much of the discussion of the reasons why it would be a hardship for Walmart to accommodate Mr. Hedekin strike me as reminiscent of the reasons why for many years, believe I think it was feasible to accommodate working mothers. They would say they can't work past five o'clock. They can't work weekends. They'll leave their job vacant when they take maternity leave. They'll quit after a year and so on and so on. Somehow it all worked out through the years. Can we really know if an accommodation is feasible unless an employer makes more of an effort than Walmart did here to try it? Your Honor, the government is flatly wrong that there's insufficient evidence or record evidence about whether it's possible. We have provided in the special appendix, starting at essay 76, the actual schedules for two years of the managers. Right? And we have provided mathematical proof. The manager who worked the fewest Saturdays worked 48% of the Saturdays. And the manager who worked the most Saturdays worked over 80% of the Saturdays. And as this court held in Baz and Nosen, Walmart is not required to nor are they able to force other employees to work on his behalf, which leaves him with the opportunity of perhaps trying to do a shift swap. But what you'll find in special appendix 77 and onwards is more time off requests than can be granted. It's just not possible that he would get off every Saturday, that he would be able to get off 24 more Saturdays than his luckiest next assistant manager. And the fact that there are more requests off than can be granted, which is both in show that it was not possible to accommodate him in that position, although they found a very comparable position to slot him in. I wanted to say one thing about the night managers versus the day managers, because I think the government sows a lot of confusion on this point. So there are two night managers. And there are six day managers. Could I stop you for one second? Yes, Ronnie. Yeah. Do you think that an employer has an obligation in this kind of situation to do a trial run to see if a flexible schedule can actually work? No, Your Honor. I mean, we fundamentally disagree with the government that undue hardship even comes into the analysis unless you can't reasonably accommodate them. And since there's nothing unreasonable about how Walmart accommodated him, you don't have to make it to undue hardship. But going to undue hardship, Your Honor, the fact is we provided evidence that shows it's mathematically impossible. And even if it's not mathematically impossible, the government just fails to engage with the other undue hardship issues of camping Mr. Hedekind in one position and not allowing him to rotate. So basic question here is whether or not Walmart made a good faith effort to engage in a dialogue. Am I right? Yes, Your Honor. And doesn't the record show in the testimony of the HR manager that in a previous case, she had, in fact, resolved this particular problem by offering and having an applicant accept the job she offered this gentleman? So, yes, he was accommodated, but there was a paperwork process and he had to fill out paperwork. So that's what I would point out. Doesn't this go, isn't this relevant and probative evidence of her good faith? It is because it resolves this problem this way once before. I think so, Your Honor. And again, she made that this is in the Euclid case or the Euclid store. And she had that individual also go through a paperwork process. And if you read Ms. Ayerin's deposition, it's very much about when they're going to slot him in a new position, not if they're going to slot him in the position. And the other thing I would point the court's attention to is ECF 47 and 14 through 15, where Ms. Ayerin talks about how she offered to help him through the process. The government says that she said, she said, you just go fill out that application. But she offered to help him through the hiring process. And Ms. Ayerin is the HR market manager. She is the person who helps hire the managerial staff. She's the one who schedules the interview. She's going to help him through this process, just like she helped the Euclid gentleman through his process. Going back to the reasonable or excuse me, the undue burden points. As I said, there's the night managers and then there's the day managers. So on the night managers, there's only two night managers. Unrebutted evidence in the record is you have to have a night manager there on Friday night or else the store is not recovered and not properly stocked between two of the busiest days of the week. And so if you only have two night managers and Mr. Haddikan is never able to work on a Friday night, that means that the other manager can never be sick, can never go on vacation and can never take that day off. Or the alternative is that Walmart's left without their night manager and that's undue hardship. And apart from that possibility, and I take your point, Judge Rovner, apart from impossibility, there's also this issue of undue hardship. By camping him in the night manager position in perpetuity, he's never going to be rotated through all the positions. And it's unrebutted in the evidence that Walmart rotates their managers through all the positions for a couple of reasons. One, so that they can be prepared to be store managers and two, so that they can fill in for all the other managers and understand how the whole store works. The problem is not all of Walmart is open at night. There's several key functions that are never open at night, including the bakery, the deli, the money center. And, you know, there's a lot of talk about in the sporting goods section, needing manager support for firearms and hunting licenses. And none of that is open at night. So that's undue hardship to Walmart because he's going to be unable to rotate through. He's impeding other people's progress. And he himself is a less valuable as a manager than otherwise. During the daytime, so we have six... At Walmart, for instance, did Walmart look into whether or not one of the other managers might want to be a night manager? I don't know that I fully understand your question, Your Honor. They looked at the scheduling. I'm not sure that they pulled any employees to see what positions they wanted. They do have to circle everybody through all the positions, though. And Lee Spood, who was the corporate representative, his deposition we included at the beginning of the special appendix, talked about how Walmart used to not rotate them through, but found that that led to inefficiencies and led to these managers not being well-rounded. And they ended that practice of not rotating them. And so that's why we have really good evidence about undue hardship if they don't rotate. On the daytime side, again, looking at Exhibit 17 and Mr. Buck's own testimony. So the government called this evidence speculative. I don't know how you can say having a declaration from the very person who made the schedules is speculative. It's from his experience of running that store for many years. And in that declaration, he acknowledged that it wasn't possible to give someone every Saturday off. And if you look at Exhibit 17, I went through and counted up all the times managers are unavailable on Saturday, the time they ask off, the time they're out of the store. And it's 15% higher on Saturday than any other day. Saturday is particularly difficult for this resort town store, particularly hard in the summer. And remember, Mr. Hedekand was applying right at the beginning of the summer. So you have an understaffed store with a cadre of management who are working all hours. And Mr. Hedekand couldn't alleviate that burden. And it would have been an undue hardship to accommodate him in that position. You see, at least in the abstract, it seems possible to me that there might be other assistant managers who would have been willing to take more Saturday shifts if they could be assured of more time off on Sunday or weekend evenings. How can we know whether it's feasible to accommodate someone in Mr. Hedekand's position without actually asking other employees whether they're willing and able to accommodate someone else's scheduling needs? How do we know? You're basically looking at the past. What I'm thinking of is the future. In other words, maybe some of them would have really liked that. Your Honor. We can't know. I think we can because there's more time off requests than can be granted. So I think we know that the supply and demand, we know what the supply and the demand story is. And the other thing I would say is, Your Honor, if you don't, I'm not persuaded by that, that still doesn't resolve the undue hardship problem that we have in not being able to rotate him through all the positions. Because he couldn't even fulfill all the daytime positions because a lot of those positions require someone to be there, at least in some instances. That's the sporting goods. That's the deli. That's the bakery. So you might be able to find a daytime position to camp him in that he could never work a Saturday. But again, you have the rotation problem. And the government can't overcome this undue burden for Walmart, nor do they provide any evidence to rebut our undue burden harm. So I understand your concern about knowing that for sure. But I think because of the undue burden evidence, which is so strong in this case, that the government really doesn't have a leg to stand on. Your Honor. Thank you, Mr. Byland. Thank you, Judge Easterbrook. Mr. Kovner. Sorry, Your Honor. Just three very quick points. As to the reasonable accommodation issue, Mr. Byland has pointed to cases where there was an offer of lower pay or an application process as an accommodation. But in all of those cases, it was necessary and justified. The employer had exhausted other options before offering that. And so there would be no limiting principle to Walmart's argument about what is a reasonable accommodation here. There must be some floor beneath which an accommodation cannot go and still be deemed reasonable. The other point is that the rotational practice that Mr. Byland talks about, that what we're saying would not preclude Walmart from rotating Mr. Hedikin. He could have worked a Sunday through Thursday schedule to begin with. He would have been rotated once a year at most. And then he could have switched to a Monday through Friday daytime schedule, or he could have shifted to a different area of responsibility. So Walmart has just not met its burden on showing that any and all of these accommodations would have posed an undue hardship. And does the court have any additional questions? Thank you very much, counsel. The case is taken under advisement. Thank you. The court will take a 10-minute break before calling the next case.